IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| In re: ) | |
| ) | CHAPTER 13 |
| **Marcus Steven Stanley,** ) | |
| ) | CASE NO. 15-70378 |
| Debtor. ) | |

## MEMORANDUM OPINION

This matter is before the Court on a Motion to Sell Property Free and Clear of Liens (the "Motion") filed by the debtor, Marcus Steven Stanley (the "Debtor"). The Motion seeks approval of the sale of certain property owned by the Debtor in Washington County, Virginia, commonly known as the Toby Hanna Farm (the "Property"). Motion ¶ 4. The sale was conducted by auction on June 11, 2016 (the "Auction"). First Bank & Trust Company ("First Bank"), by counsel, filed a response in support of the Motion. The Debtor subsequently filed a response to his own Motion, alleging that the sales price is, in the Debtor's opinion, "very insufficient," namely that the highest bid received at the Auction is less than one-third of the fair market value of the Property. Docket No. 41 ¶¶ 1-3. The Debtor requested that another sale be held or that the period for marketing the Property be extended in an attempt to seek a private buyer for the Property. *Id.* ¶ 4.

On July 7, 2016, the Court held an evidentiary hearing on the matter at which time the Court was advised that the auctioneer conducting the sale for the realty company approved by the Court purchased the property through Farmlands, Inc. ("Farmlands"), a corporation wholly-owned and controlled by that auctioneer. The Debtor contended that no disclosure of this relationship was made at or prior to the sale. Given that Farmlands, as the purchaser at the sale, the realty company, and the auctioneer were not given notice of the Debtor's Motion or the

objection thereto, the Court set a further hearing for July 20, 2016, at which time all parties were given notice and an opportunity to be heard. Following the July 20, 2016 hearing, the Court took the matter under advisement.

For the reasons set forth below, the Court will grant the Debtor's Motion to sell the Property to Farmlands; however, the Court will deny the requested 5% commission and reimbursement of expenses based on the lack of disclosure by the realty company and the auctioneer of the auctioneer's relationship to the purchasing entity at the Auction.

FINDINGS OF FACT

On November 2, 2015, the Court entered an Order Confirming Plan (the "Confirmation Order"), which confirmed the Debtor's amended Chapter 13 plan. *See* Confirmation Order, Docket No. 36. The Confirmation Order required, *inter alia*, the following:

> Debtor shall continue to list the Toby Hanna Farm on which [First Bank] has a valid first lien with Meade Realty. Seller shall try and sell said lots with the assistance of Meade Realty. If no contract is executed by the debtor to sell said farm by May 1, 2016, said farm shall be auctioned by the debtor within 45 days thereafter, with a Motion to Sell Free and Clear of Liens filed with the Court within 15 days after the auction seeking approval of said sale, with the net sale proceeds to be applied to the balance of the [First Bank] loan secured by said property.

*Id.* ¶ 4(d). No private sale contract was obtained by the May 1, 2016 deadline, and the Auction was conducted on June 11, 2016 at the Property. Motion, Ex. B.

On June 23, 2016, the Debtor filed the Motion in compliance with the Confirmation Order requesting approval of the sale of the Property. Motion, Docket No. 38. First Bank, by counsel, filed a response in support of the Motion. Docket No. 40. The Debtor subsequently filed a response to his own Motion, alleging that the sales price was, in the Debtor's opinion, "very insufficient," namely that the highest bid received at the Auction, $55,000.00, is less than

2

one-third of the fair market value of the Property, previously appraised at $180,000.00.[1]  Docket No. 41 ¶¶ 1-3.  The Debtor requests that another sale be held or that the period for marketing the Property be extended in an attempt to seek a private buyer for the Property.  *Id.* ¶ 4.

On July 7, 2016, the Court held an evidentiary hearing on the matter.  Counsel for the Debtor stated that, while the Debtor chose Meade Realty Auction Services ("Meade Realty") as the auctioneering company, his client expressed concern that the auctioneer who conducted the Auction for Meade Realty, Michael E. Anderson ("Anderson" or "Auctioneer"), was actually the high bidder and purchased the Property on behalf of his company, Farmlands.  The Debtor testified that no announcement was made that the auctioneer would be bidding on his own behalf.  Counsel for First Bank stated that a representative from First Bank appeared at the sale and had authority to credit bid, but chose not to do so.  Counsel for First Bank was unsure whether proper disclosure was made regarding Anderson's bidding.

The Court expressed concern with the Debtor's request to set aside the sale without all the parties in interest being notified of the hearing, and the Court set the matter for further hearing on July 20, 2016 at 1:30 p.m. in Abingdon. At the July 20 hearing, the Debtor; Fred Tweed ("Tweed"), a realtor with Meade Realty; Charles Meade ("Meade"), the principal of Meade Realty; the Auctioneer; and Gene Copenhaver ("Copenhaver"), a Senior Vice President of First Bank, each appeared and testified.  The facts are, for the most part, not in dispute.

---

[1] The Confirmation Order provision reflecting the agreement negotiated by the Debtor and First Bank mandated that a motion to approve the sale be filed within a specific time after the Auction, thus putting the Debtor in the position of objecting to his own Motion.

### The Property and the Listing

Tweed testified that the Property, commonly known as the Toby Hanna Farm, consists of one tract containing approximately 29 acres ("Tract 1") and a second tract containing approximately 25 ½ acres ("Tract 2"). Together, the total acreage of Tract 1 and Tract 2 is approximately 54 ½ acres. The Property contains a rental house, a log barn, and fences. The Property contains no road frontage. The Property does contain a right of way, extending approximately one mile, which passes over several neighboring landowners' properties. The right of way consists mostly of a dirt road, is wide enough for one car, and passes between two barns and over a creek in places. The Debtor's Schedule A lists a valuation of $187,500 based on a tax assessment.

The Debtor confirmed Tweed and Meade Realty were collectively retained as the realtor in this case to list the Property for sale. The Debtor agreed that the Property would first be marketed by Tweed and Meade Realty, and if they failed to produce a buyer, the Auction would be held. The Debtor also agreed to seek approval for the Auction from the Court. Additionally, the Debtor advised he has known Tweed for 15-20 years and was aware, at the time Tweed was retained as the Debtor's realtor, that Tweed has served as Debtor's counsel's realtor at various times in the past.

Tweed attempted to sell the Property along with two other pieces of property owned by the Debtor. Tweed had listed properties for the Debtor prior to bankruptcy, including some townhouses. Tweed listed the Property for approximately one year. The Property was initially listed with a purchase price of $215,000.00, but that price was later reduced to $175,000.00, and then to $165,000.00. During the course of the listing, Tweed received a verbal $90,000.00 offer, but after consulting with the Debtor, Tweed told the potential buyer that the offer was not

enough. No further contact was had with that party. No other offers, written or verbal, were received on the Property. Because no contract was executed for the sale of the Property by May 1, 2016, in accord with the Confirmation Order, the Auction was scheduled.

The Auction

The Auction was advertised as an absolute auction, scheduled for June 11, 2016. Meade Realty advertised the auction for two weeks in the local newspaper, the Bristol Herald Courier, at a total cost of $273.00. Additionally, Meade Realty printed around 400 informational brochures for a display box, and mailed approximately 50 brochures to potential buyers that Meade Realty thought might be interested in the sale. Signs advertising the Auction were placed on the road leading to the property.

On the day of the Auction, approximately 16-17 people were present for the Auction, which began at 10:30 a.m. on site. Among those present at the Auction were the Debtor; Anderson;[2] Meade; Mike Brillhart, Ken Johnson, and John Crigger ("Crigger") of Meade Realty Auction Services; Copenhaver; and several of the neighboring property owners, including Kenneth and Eileen Long, Ronald Mccroskey, and David Counts ("Counts"),[3] among others. Thirteen people registered as bidders at the auction, but neither Anderson nor Farmlands registered as a bidder.

Meade made pre-auction announcements and Anderson cried the sale as auctioneer on behalf of Meade Realty. Anderson asked for initial bids at $200,000.00, but receiving none, worked downwards receiving no bids until he started the bidding on behalf of his company, Farmlands, at $40,000.00. Anderson testified he told the crowd the Property "wasn't going to get any cheaper" and that is when he started the bidding by putting in the first bid from his own

---

[2] Anderson testified that he arrived approximately one hour prior to the Auction and walked along the property with Mike Brillhart and Ken Johnson, two associates with Meade Realty Auction Services.
[3] Counts appeared by telephone.

company, an entity separate and apart from Meade Realty. Kenneth Long then bid $42,000.00.[4] At that point, Anderson realized that he should probably not be conducting the Auction as auctioneer and bidding at his own sale.[5] He then asked Crigger to come over to tell him that he, Crigger, should cry the sale from that point. However, both Crigger and Anderson worked for Meade Realty, which was company approved to conduct the auction by the Court. Additionally, Anderson testified that he asked Copenhaver if First Bank would object to him bidding on the Property and that First Bank did not object. No such request or disclosure was made of or to the Debtor, and no announcement was made to the general public prior to or during the sale.

Thereafter, Anderson, on behalf of Farmlands, continued to bid on the Property. The bidding moved from $43,000.00 to $45,000.00 between Farmlands and Counts. Eventually, Farmlands bid the highest amount, $55,000.00, and the Auction concluded. Anderson signed the Auction sale contract on behalf of Farmlands, Inc. The Debtor signed the contract as well. Anderson testified that, because the Auction was an absolute auction, he thought he was doing the Debtor a favor by moving the bidding upward with the other interested bidders. Anderson further testified that he had no intention of "hurt[ing] the process," and advised that he intended to graze cattle on the Property.

The Debtor testified that he was not aware that either First Bank or Anderson would be bidding at the Auction, but the Debtor admitted that he did not read the advertisements thoroughly. The Debtor did understand the auction was an absolute auction, not one subject to seller confirmation. Copenhaver testified that he was only authorized to bid $25,000.00 on the Property on behalf of First Bank, and thus, did not bid on the Property. Copenhaver and First Bank were aware of the appraised value of the Property, but after touring the Property with the

---

[4] Anderson testified that Kenneth Long's "group" made this bid, but Anderson did not specify who the group consisted of.
[5] Anderson also testified that he "may have bid $43,000.00" at this point.

bank's credit officer and evaluating the lack of road frontage and the near mile-long access road which ran across multiple parties' properties, the bank decided it would not authorize Copenhaver to bid more than $25,000.00 to avoid the risk of taking the Property into real estate owned and potentially having an access issue. The Debtor's schedules reflect that his properties secured debt to First Bank in the amount of $160,155.00 as of the petition date.[6] First Bank's Objection to Confirmation reflected a balance due as of filing of $160,199.40, and that First Bank's lien was subordinate to unpaid real estate taxes of $5,614.96.[7]

## CONCLUSIONS OF LAW

This Court has jurisdiction of this matter by virtue of the provisions of 28 U.S.C. §§ 1334(a) and 157(a) and the delegation made to this Court by Order from the District Court on December 6, 1994, and Rule 3 of the Local Rules of the United States District Court for the Western District of Virginia. This Court further concludes that this matter is a "core" bankruptcy proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), (N), and (O).

### I.      The Auctioneer Violated the Regulations of the Virginia Auctioneers Board

Historically, auctioneers in Virginia were not allowed to bid on properties over which the auctioneers were conducting. *See, e.g.*, *Brock v. Rice*, 68 Va. (27 Gratt.) 812, 816 (Va. 1876) ("No person employed or concerned in selling at a judicial sale is permitted to become a purchaser, or even to act as agent of a purchaser. It is impossible with good faith to combine the inconsistent capacities of seller and buyer, crier and bidder, in one and the same transaction. . . .

---

[6] The Debtor's Schedule A and First Bank's Objection to Confirmation indicate that the properties securing First Bank include the Property as well as two parcels of land and the Debtor's principal residence located at 15675 Jasper Creek Road, Bristol, VA.
[7] First Bank's Objection to Confirmation reflects that its debt is also secured by a deed of trust on the Debtor's principal residence, which also has unpaid real estate taxes of approximately $5,800.00. There was no indication these amounts were disputed. While any additional value from the sale of the Property would no doubt have gone to First Bank, the less the bank's debt was reduced, the more the principal residence stood to bear.

7

There is an irreconcilable conflict between the two positions"). More recently, Virginia courts have treated an auctioneer's bid at his own auction as "generally voidable, rather than void, so as to be valid if ratified by the parties to the sale, and valid as to a stranger . . . ." *Holston v. Pennington*, 225 Va. 551, 558, 304 S.E.2d 287, 291 (Va. 1983). The *Holston* court cautioned, "the auctioneer is the agent of the seller throughout the sale and, after the fall of the hammer, becomes the agent of the purchaser as well. He may not, without total infidelity to these duties, bid either for himself or for another, nor may he do so indirectly through an agent" without proper ratification and validation as described above. *Id.*

Currently, the state regulations pertaining to auctioneers allow auctioneers to bid on properties at sales over which they are presiding if adequate disclosure is provided. Specifically, Title 18, Section 25-21-120 of the Virginia Administrative Code entitled "Conduct at auctions" provides, in part, as follows: "The licensee shall neither bid on his own behalf nor knowingly accept a bid made on his behalf *unless notice has been given that such bidding will be permitted*." 18 VAC § 25-21-120 (emphasis added).[8]

In this case, Anderson, as auctioneer, admitted he failed to notify disclose to all interested parties that he would be bidding at the auction prior to announcing his initial $40,000.00 bid. At that point, Anderson was still presiding over the Auction as auctioneer, despite bidding himself, and only later turned the auctioneering duties over to Crigger. Crigger was not present at the hearing and there is no evidence that he or anyone else at Meade Realty made a disclosure that one of his fellow auctioneers at Meade Realty was bidding at the sale. Neither the Debtor nor anyone else, other than possibly First Bank, was aware that Anderson would be bidding at the

---

[8] Derived from VR150-01-2:1 § 4.3, eff. Aug. 1, 1995; amended, Va. Register Vol. 25, Issue 7, eff. Feb. 1, 2009. Amended, Va. Register Vol. 32, Issue 1, eff. November 1, 2015. The November 1, 2015 amendment substituted "licensee" for "auctioneer or auction firm" in three places, and substituted "neither" for "not." 18 VAC § 25-21-120 (2016) (Historical Notes).

auction in advance of Anderson's bidding. Therefore, Anderson and Meade Realty violated Section 25-21-120 of the Regulations of the Virginia Auctioneers Board by Anderson bidding on his own behalf without providing notice that his bidding would be permitted.

### II. Auction Sales Conducted Within a Bankruptcy Case

Auction sales conducted within the bankruptcy court involve even greater protections. A trustee may employ professional persons, such as auctioneers, to perform various services related to the debtor's bankruptcy, including auction sales.[9] *See* 11 U.S.C. § 327. Auctioneers employed in the bankruptcy context must "not hold or represent an interest adverse to the estate, and [must be] disinterested persons . . . ." *Id.* § 327(a).

The Bankruptcy Code defines a disinterested person as one who is not an insider. *Id.* § 101(14)(A). Section 101(31) provides enumerated categories, such as a "relative of the debtor or of a general partner of the debtor." *Id.* § 101(31)(A)(i). Any professional person who fits into one of these enumerated categories is considered a "statutory insider" of the debtor, and therefore, an "interested" person. *Lynch v. Joe Denning & Sons Farms (In re Joe Denning & Sons Farms)*, 467 B.R. 369, 373 (E.D.N.C. 2012). The statutory text defining an insider, however, is a non-exhaustive list in that it uses the word "includes." *See* 11 U.S.C. § 101(31); *In re Winslow*, 473 B.R. 94, 101 (E.D.N.C. 2012). Thus, courts have determined insiders that fall outside of the statutorily defined list are "non-statutory insiders." *Id.* (citing *Schubert v. Lucent Techs. Inc. (In re Winstar Commc'ns, Inc.)*, 554 F.3d 382, 395 (3d Cir. 2009); *Anstine v. Carl Zeiss Meditec AG (In re U.S. Med., Inc.)*, 531 F.3d 1272, 1276 (10th Cir. 2008); *Koch v. Rogers (In re Broumas)*, Nos. 97–1182, 97–1183, 1998 U.S. App. LEXIS 3070, 1998 WL 77842, at *7 (4th Cir. Feb. 24, 1998) (per curiam) (unpublished table decision); *Butler v. David Shaw, Inc.*, 72

---

[9] Section 1303 of the Bankruptcy Code provides that the debtor in a Chapter 13 case shall have certain rights and powers of a trustee, including the ability to sell property under 11 U.S.C. § 363(b). *See* 11 U.S.C. § 1303.

F.3d 437, 443 (4th Cir. 1996); *In re Friedman*, 126 B.R. 63, 69–70 (B.A.P. 9th Cir. 1991); *In re Three Flint Hill*, 213 B.R. 292, 297–98 (D. Md. 1997)).

Determining non-statutory insider status requires analyzing "the closeness of the relationship between the debtor and the employed professional, as well as [] whether the challenged transaction was made at arm's length." *Winslow*, 473 B.R. at 101. The determination of non-statutory insider status is "fundamentally factual." *Id.* A non-statutory insider determination "may be based on a professional or business relationship with the debtor . . . where that relationship . . . is close enough for the non-statutory insider to gain an advantage attributable simply to affinity rather than to the course of business dealings between the parties." *Id.* at 103 (citing *Friedman*, 126 B.R. at 70).

Here, although the Debtor testified that his father, a well-known businessman for many years, knew Anderson and the other employees and principal of Meade Realty, Anderson does not fall within the non-statutory insider category. Anderson does not appear to have any relationship with the Debtor outside of being employed to conduct this auction. No mention of any prior dealings between the Debtor and Anderson were brought up during the trial. Further, none of the testimony at trial indicated any sort of affinity between Anderson and the Debtor. Thus, Anderson is not a non-statutory insider.

Because Anderson is neither a statutory insider nor a non-statutory insider, Anderson was disinterested at the time he was employed to conduct the auction. However, once Anderson begin bidding at the Auction without prior notification or disclosure, the question of whether

Anderson violated his fiduciary duties as a professional employed pursuant to an Order of this Court, i.e. in the bankruptcy context, comes into play.[10]

### III. Per Se Violation vs. Inherently Fair

Courts are divided over whether to adopt a *per se* rule regarding sales of bankruptcy estate property to insiders and estate professionals, or whether to apply an "inherently fair" approach. Courts adopting the *per se* rule have held that neither the trustee, a debtor in possession, nor their professionals may directly or indirectly acquire assets of a bankruptcy estate. *See e.g.*, *In re Crestview Funeral Home, Inc.*, 287 B.R. 832, 837–38 (Bankr. D.N.M. 2002) (ordering an auctioneer's fees disgorged since he and his contract employees bought property at the auction); *In re Allied Gaming Management, Inc.*, 209 B.R. 201 (Bankr. W.D. La. 1997) (holding that an estate accountant cannot participate in ownership of the company acquiring the debtor under the plan of reorganization); *In re Sauer*, 191 B.R. 402 (Bankr. D. Neb. 1995) (preventing the purchase of a foreclosed home by counsel for the debtor in possession); *In re Rahe*, 178 B.R. 801 (Bankr. D. Neb. 1995) (finding that it is unethical and criminal for trustee's counsel to purchase estate property); *In re Q.P.S., Inc.*, 99 B.R. 843 (Bankr. W.D. Tenn. 1989) (holding that a debtor in possession's accountant was prohibited from buying a car from the bankruptcy estate).

Courts adopting the *per se* rule have held that, as a fiduciary of the estate, a bankruptcy trustee and his agents and employees may not purchase property of the bankruptcy estate. *Rahe*, 178 B.R. at 802 (*citing In re Frazin & Oppenheim*, 181 F. 307, 309 (2d Cir. 1910); *Q.P.S., Inc.*, 99 B.R. at 845). Further, these courts have determined that, "[r]egardless of whether the trustee

---

[10] At the point Anderson began bidding on the Property, he then became an insider by virtue of his role as auctioneer. *Cf. In re Chuck's Const. Co., Inc.*, 424 B.R. 202, 203-07 (Bankr. D.S.C. 2010) (determining that an equipment sales agent who proposed to purchase equipment for which he was employed by the Court to sell was an insider by virtue of his position).

or the trustee's agent and/or employee in fact profits from the transaction at the expense of the estate, neither a bankruptcy trustee nor his agents and/or employees may purchase properties of the estate, even for a *fair* price." *Q.P.S., Inc.*, 99 B.R. at 845 (citations omitted) (emphasis in original). Accordingly, under this *per se* rule, attorneys, accountants, appraisers, and other agents or employees of bankruptcy trustees may not purchase property of the bankruptcy estate. *Crestview Funeral Home*, 287 B.R. at 838 (citing *Rahe*, 178 B.R. at 802; *Allied Gaming Mgmt,*, 209 B.R. at 203 (Bankr. W.D. La. 1997) (accountant for Chapter 11 estate not allowed to acquire estate property through reorganized plan); *Q.P.S., Inc.*, 99 B.R. at 845). The objective of this *per se* rule is "to discourage disloyalty by fiduciaries and eliminate a source of public concern over the administration of bankruptcy estates." *Crestview Funeral Home*, 287 B.R. at 838 (quoting *In re Grodel Manufacturing, Inc.*, 33 B.R. 693, 696 (Bankr. D. Conn. 1983)) (internal quotation marks omitted).

In *Crestview*, the court determined that the auctioneer, as an agent of the trustee, "owed a fiduciary duty to the bankruptcy estate and should not have purchased property of the estate." *Crestview Funeral Home*, 287 B.R. at 838. The court further held that the auctioneer's employees, even if independent contractors, are disqualified from purchasing property at a bankruptcy estate auction. *Id.* Notably, the court determined that "[t]rustees should not allow this practice because it is prohibited by 18 U.S.C. § 154 and because it casts a shadow of impropriety [on] bankruptcy sales in general."[11] *Id.* Thus, the court ordered the disgorgement of fees paid to the auctioneer. *Id.* at 838-39. While the Chapter 13 Trustee did not conduct the sale in this case, Meade Realty was retained by the Debtor, and the Court approved that retention pursuant to the terms of the Confirmation Order. The Auctioneer, as an employee of Meade

---

[11] 18 U.S.C. § 154 is a criminal provision which provides for fines and the forfeiture of a person's office who, "being a custodian, trustee, marshal, or other officer of the court—(1) knowingly purchases, directly or indirectly, any property of the estate of which the person is such an officer in a case under title 11; . . . ."

12

Realty, was still retained as a disinterested professional person, and the Court maintained oversight over the conduct of the sale and approval of Meade Realty's compensation pursuant to the Confirmation Order and the Order approving its employment.

Other courts have held that the purchase of assets of the estate does not constitute a *per se* violation of fiduciary obligations. *See, e.g.*, *In re Cornerstone Products, Inc.*, 416 B.R. 591, 610-12 (Bankr. E.D. Tex. 2008); *William Herzog v. Stopol, Inc. (In re Cornerstone Products Inc.)*, 416 B.R. 591, 611 (Bankr. E.D. Tex. 2008); *Fulton State Bank v. Schipper (In re Schipper)*, 109 B.R. 832, 835-36 (Bankr. N.D. Ill. 1989); *In re Brook Valley IV*, 347 B.R. 662, 675-76 (B.A.P. 8th Cir. 2006). "Rather, the fiduciary need only prove that the transaction was inherently fair." *Cornerstone Products*, 416 B.R. at 611. These courts hold that a fiduciary may buy assets of a debtor if the sale of estate property is in the estate's best interest, shown by arm's length, good faith negotiations with full disclosure. *See Brook Valley IV*, 347 B.R. at 675-76; *In re Apex Oil Co.*, 92 B.R. 847, 869-70 (Bankr. E.D. Mo. 1988) (holding that an insider may buy assets of a debtor if there are arms-length, good faith negotiations with full disclosure). Under the "inherently fair" approach, it is the fiduciary's burden to demonstrate that the transaction was inherently fair by showing that the circumstances of the transaction were at arm's length. *Brook Valley IV*, 347 B.R. at 676. Courts adopting the inherently fair approach have determined that it is the court's responsibility to ensure good faith, protect the interests of the various parties, and guard the integrity of the process. *In re Chuck's Const. Co, Inc.*, 424 B.R. 202, 206 (Bankr. D.S.C. 2010) (adopting neither approach but disapproving of a sale to an insider equipment sales agent where facts were falsified).

In addition, courts are in agreement that, no matter the approach taken, public policy requires avoiding appearances of impropriety which would undermine the integrity of the

13

bankruptcy system. *Id.* at 205. The overarching principle that guides courts in considering insider sales of property of the estate was set over a century ago by the Second Circuit:

> [N]o consideration of public policy is deeper grounded upon fundamental principles—upon principles which reach the very foundations of judicial authority—than that courts and court officers must be disinterested in the management of estates committed to their charge. It cannot be permitted that officers appointed by courts to perform duties regarding property in custody of the law should speculate therein. It cannot be permitted that court officials should use their official positions for personal profit. The question is not one of fraud or good faith, of gain or loss to the estate, in a particular instance. The rule goes far deeper than that. It is applicable in every case in order to secure and maintain the impartial administration of justice.
>
> Upon no courts is the obligation to enforce these principles of public policy greater than upon the courts of bankruptcy of the United States. The object of Congress in enacting the bankruptcy laws was to secure the efficient and fair administration of estates. The one thing, perhaps more than all others, which creditors and bankrupt alike have the right to expect from those having official duties to perform relating to the property of the estate, is disinterestedness in its disposition and liquidation.

*Frazin & Oppenheim*, 181 F. at 310.

### IV.  The "Inherently Fair" Approach is Adopted by the Court

In the circumstances of this case, the Court sides with the courts adopting the "inherently fair" approach. Accordingly, since Anderson purchased the Property, the burden is on Anderson "to demonstrate that the transaction was inherently fair by showing that the circumstances of the transaction were at arm's length." *Brook Valley IV*, 347 B.R. at 676. Anderson is also required to show that the sale of the Property to him is "in the estate's best interest, shown by full disclosure and good faith negotiation." *Id.*

In this case, although Anderson failed to disclose to the Debtor or the Auction attendees, prior to his bidding, that he would be bidding on the Property, the evidence supports that the sale is in the best interest of the estate. Tweed testified that after listing the Property on the market for almost a year, the one verbal offer he received was rejected by the Debtor as too low, and the

14

offeror never responded with a higher offer.  The fair value waters were well tested prior to the Auction, and no viable purchaser came forward.  Indeed, not only did the Debtor attempt to obtain a buyer in advance of filing his current bankruptcy case, but he was also provided an additional period of time to find a buyer before the Auction was conducted during this case.  This was incorporated into the Chapter 13 plan which the Debtor proposed, and First Bank agreed to it.

Regarding the Auction itself, although the advertising budget was only $273.00, the Auction was advertised in the local newspaper of general circulation, the Bristol Herald Courier, for two weeks.  Additionally, approximately 50 brochures were mailed to potential bidders identified by Meade Realty and the Auction was advertised on Meade Realty Auction Services' website.  An information box with brochures was available on site and signs were placed on the road leading to the Property where the Auction took place.  Thus, it does not appear to the Court that the Auction was under advertised for Anderson's gain.

Further, the $55,000.00 Auction sales price is in the best interest of the estate because, if the Court declines to approve the sale, there is no evidence the Debtor will receive as high of an offer—much less higher—if a second auction is conducted.  First Bank, as the secured creditor who stands to receive most of the proceeds if the Property is sold, advises it did not intend to submit a significant credit bid.  Its rationale in capping its credit bid on the Property at $25,000.00 was made on its best business judgment, considering the risk and burdens of taking the property into real estate owned and potential future access concerns, and there was no evidence the bank intended to rethink that analysis if the Property was resold.  Even if the Court allowed the Property to again be listed for sale on the market, there is also no indication that any

specific offers would be received, other than the bank's minimum credit bid, resulting in further expenses to the estate.

Most importantly, the advertising for the auction, the bidding process, and the actual bidding at the Auction were conducted at arms-length, and good-faith negotiations took place. Anderson was not the only bidder at the sale, and the point he started bidding was above First Bank's minimum credit bid. In addition to Anderson's bids, several other bidders, including neighboring property owners, were present and able to bid both in person and by telephone. There is no evidence that any higher bids than the $55,000.00 bid by Anderson were offered and improperly discredited. Other than Anderson's lack of disclosure that he would be bidding, the Auction had all the hallmarks of an active and competitively conducted sale.

### V.    Remedy

For the reasons set forth above, despite Meade Realty's auctioneer being the successful bidder at the Auction, the Court finds the Auction was inherently fair, and the Court will approve the sale. However, Anderson and Meade Realty violated the Regulations of the Virginia Auctioneers Board by not disclosing that, as auctioneer, Anderson would be bidding on his own behalf through a company he owned and controlled. Disclosure and transparency are central to the integrity of the bankruptcy process, and critical to public confidence that the playing field is level for all. A stated in *In re Chuck's Construction Co., Inc.*, 424 B.R. 202 (Bankr. D.S.C. 2010), "[t]hat the details of a sale are so easily hidden or misrepresented strongly supports caution in ever approving a sale to an estate professional." *Id.* at 207. Thus, the Court will deny the 5% commission plus reimbursement of expenses Meade Realty seeks as the Court-approved

auctioneer in this case.[12]  This is in line with the Court's duties to maintain disinterestedness, avoid the appearance of impropriety, and ensure impartiality in the administration of the estate. Accordingly, the sale will be approved, with Meade Realty receiving no commission or reimbursement of expenses in the connection with the Auction.

An Order to such effect will be entered contemporaneously herewith.

Decided this 29th day of July, 2016.

_____
UNITED STATES BANKRUPTCY JUDGE

---

[12] This matter is distinct from *In re Cornerstone Products, Inc.* where the bankruptcy court allowed a professional entity employed by the estate to purchase assets of the estate directly, *prior to* the auction sale. *Cornerstone Products*, 416 B.R. at 611-12.  The court in that case allowed the entity to retain its commission, noting that the estate "obtained a significantly higher price for the [property]" since there "was no longer an auction on the horizon." *Id.* at 611.